UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Columbia Insurance Company, | Case No. 11-CV-01040 (PAM/SER) |
| Plaintiff, | |
| v. | **DEFENDANT COMTRAC SERVICES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND DECLARATORY JUDGMENT** |
| Daniel Tibbott; Comtrac Services, Inc.; Comcast of Minnesota, Inc.; Woodmount Townhouses Associates LLLP; and Heidi Indehar, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Comtrac Services, Inc. ("Comtrac") contracted with Daniel Tibbott ("Tibbott"), an independent contractor, to perform broadband services in Minnesota for Comcast of Minnesota, Inc. ("Comcast"). After Tibbott's work was completed for the day, several units were damaged by fire. The cause of the fire is disputed and the subject of litigation in Washington County, Minnesota ("the underlying litigation").

Prior to initiation of the underlying litigation, Tibbott's insurer, Columbia Insurance Company ("Columbia"), denied coverage for the fire loss claiming intentional concealment or material misrepresentations by Tibbott voided coverage under his Commercial General Liability ("CGL") policy. Columbia has therefore refused to defend Tibbott, Comtrac or Comcast under Tibbott's CGL

policy or the Commercial Umbrella Liability ("CUL") policy Tibbott purchased from Columbia.

However, coverage exists, and a duty to defend and indemnify arises under both Tibbott's CGL and CUL policies for five independent reasons. First, the CGL policy was not voidable under Columbia's fifteen-day grace period policy during which time Tibbott undisputedly made his past-due premium payment. Second, Tibbott could not have intentionally concealed or materially misrepresented facts since it is disputed as to whether his insurance agent asked him, inappropriately under Columbia's grace policy, whether he was aware of any "loss" or "claim." Third, the evidence shows that Tibbott purchased additional insured coverage, which Columbia failed to issue when it provided illusory Additional Insured Endorsements, and when it refused to provide coverage mandated by the Premier Endorsement for Comtrac, an additional insured pursuant to its written contract with Tibbott. Fourth, the CUL policy, which undisputedly was paid and in full force at the time of the fire, contains a duty to defend and indemnify Comtrac, an additional insured on the scheduled underlying CGL policy. Fifth, the Independent Contractor Agreement between Tibbott and Comtrac is an insured contract for tort liability arising out of Tibbott's work.

For any or all of these reasons, Comtrac respectfully seeks an Order from the Court: (1) granting its Motion for Summary Judgment; and (2) declaring that

Columbia is obligated to defend and indemnify Comtrac, an additional insured under Tibbott's CGL and CUL policies, in the underlying litigation.

## LEGAL ISSUES

1.     Does Columbia's grace period policy preclude it from denying coverage under the CGL policy since Tibbott's past-due premium payment was made within 15 days of the cancelation date?

2.     Does the dispute regarding the veracity of the conversation between Tibbott, his agent and Columbia, and whether he was asked about any "losses" or "claims" during the grace period, permit Columbia to deny coverage under the CGL policy's Fraud and Concealment provision?

3.     Did Columbia breach its contract when it issued an illusory Additional Insured Endorsement which failed to identify Comtrac on the Schedule and denied coverage to Comtrac under the Premier Endorsement?

4.     Is Columbia obligated to defend and indemnify Comtrac, an additional insured on the scheduled underlying insurance, under Tibbott's CUL policy?

5.     Is the Independent Contractor Agreement between Tibbott and Comtrac an insured contract under the CGL and CUL policies requiring Columbia to defend and indemnify Comtrac?

## STATEMENT OF UNDISPUTED FACTS

**I.     Comcast's Contract with Comtrac**

In January 2010, Comcast contracted with Comtrac for the installation, disconnection and construction of broadband communication services.  (Vendor

Agreement for Broadband Installation/Disconnection/Construction, dated January 1, 2010, attached as Exhibit 1 to the Affidavit of Stacy E. Ertz ("Ertz Aff.")  As part of the Vendor Agreement, Comtrac and its sub-contractors[1] agreed to obtain and maintain CGL insurance in the sum of $1,000,000 and Umbrella/Excess insurance in the sum of $5,000,000 for each occurrence.  (Id. at pp. 15-16)  All insurance was to name Comcast as an additional insured.  (Id. at p. 16)

## II.   Comtrac's Contract with Tibbott

Comtrac retained Tibbott to perform work under the Vendor Agreement. (Independent Contractor Agreement For Replacement of Maspro Taps in St. Paul, MN, dated May 24, 2010 attached as Ex. 2 to Ertz Aff.)  As part of the Independent Contract Agreement, Tibbott agreed to:

> . . . hold harmless and indemnify Comtrac Services, Inc. against any and all claims, liability or loss arising out of Independent Contractor's performance of the work contemplated herein, including but not limited to any claim or action for damage or injury to person or property including death.  Independent contractor agrees to defend Comtrac against any and all such claims or actions . . .

(Id. at ¶ 4)

As for insurance, the Independent Contractor Agreement provided:

> **Compensation to Contractor**. * * * All fee payments to Independent Contractor shall be made on a gross basis not to be reduced by those taxes which are assessed against actual employees (as a contractor, Independent Contractor shall be responsible for all employment taxes and costs, including Federal and State income taxes, FICA, FUTA, Self Employment Tax, Workers Compensation

---

[1] "[S]ub-contractor" means any person or entity that has a contract through Comtrac to perform any portion of the Work in the contractor.  (Id. at p. 2)

4

Insurance, Liability Insurance.)   ***COMTRAC Services is to be named additionally insured*** on Certificate.   10% will be held from each invoice for any Independent Contractor that is not covered by Insurance. * * *

(Id. at ¶ 3)  (Emphasis added).

**Insurance.**  Independent Contractor shall add Comtrac as certificate holder and at all times during the terms of Agreement maintain and pay for insurance coverage, including but not limited to Workers Compensation, Commercial General Liability, Commercial Automobile Insurance and all others as required by Comcast.

(Id. at ¶ 6)

## III.   The Woodmount Townhouse Fire

On June 4, 2010, a fire occurred at the Woodmount Townhouses' eight-unit building in Cottage Grove, Minnesota.  (Complaint, ¶ I & ¶ 3, dated August 23, 2010, attached as Ex. 3 to Ertz Aff.)  The fire started outside a unit rented by Heidi Indehar ("Indehar").  (Id. at ¶ II & ¶ III)  The fire spread, damaging the structure and personal property owned by building occupants.  (Id. at ¶ III)

## IV.   The Woodmount Townhouse Litigation

In August 2010, the Woodmount Townhouses Associates, LLP ("Woodmount") and Indehar sued Comcast, Comtrac and Tibbott, seeking to recover damages caused by the fire.  (See Complaint)  According to their Complaint, the fire started minutes after Tibbott finished a tap/swap out for Comcast.  (Id. at ¶ IV)  As part of the tap/swap out, "Tibbott replaced the old tap with a new one, after which he installed a "shrink boot" to keep out moisture, which shrink boot was installed using a torch to shrink the boot."   (Id.)

Woodmount and Indehar claim Tibbott's negligent use of the torch caused combustible material to ignite and start the fire.   (Id.)   In addition to the negligence action against Tibbott, they also asserted claims against Comcast and Comtrac for vicarious liability.  (Id. at ¶¶ IV-VI)  Woodmount and Indehar also alleged that Comcast and Comtrac were independently negligent in failing to supervise and train employees/subcontractors, as well as in failing to comply with building, industry and governmental codes and standards.   (Id. at ¶ VI)  Woodmount and Indehar subsequently amended the Complaint, alleging breach of contract, as well as a claim for violation of Minn. Stat. § 238.24, Subd. 4, against both Comcast and Comtrac.  (Amended Complaint, ¶¶ VIII-XIII, dated May 26, 2011, attached as Ex. 4 to Ertz Aff.)

The Court in the underlying litigation dismissed Woodmount and Indehar's breach of contract and statutory warranty claims against Comcast and Comtrac. (January 11, 2012 Judgment, Order and Memorandum, attached as Ex. 5 to Ertz Aff.)  It found a fact issue as to whether Tibbott was an independent contractor for whom Comtrac is vicariously liable, should a jury determine that Tibbott's use of a pencil torch was inherently dangerous.  (Id.)  Trial will involve this issue, as well as a determination as to causal negligence for the June 2010 fire and damages, if any, for which defendants may be liable.  (Id.)

## V.    Comtrac's Tender and Columbia's Denial

Comtrac and Comcast have repeatedly tendered defense to Columbia. (Tender of Defense Letters: August 17, 2010 Correspondence from Lawrence M.

Rocheford to Daniel L. Payne; January 10, 2012 Correspondence from Stacy E. Ertz to Michael D. Hutchens/Daniel L. Payne; January 17, 2012 Correspondence from Daniel A. Haws to Daniel L. Payne, attached as Ex. 6 to Ertz Aff.)  Columbia has refused to defend anyone in the underling litigation.  (Columbia's Denial Letters: August 30, 2010 from Michael D. Hutchens/Daniel L. Payne to Lawrence M. Rocheford; January 26, 2012 Correspondence from Daniel L. Payne to Daniel A. Haws, attached as Ex. 7 to Ertz Aff.)

In its denial letters, Columbia determined that the CGL policy does not provide coverage for the June 4, 2010 fire as the policy was:

> properly cancelled for non-payment of premiums on May 25, 2010 and was not in effect at the time of the Loss.  Columbia's June 8, 2010 decision to reinstate the Policy effective back to the cancellation date was based upon Tibbott's representation on June 8, 2010 that he was aware of no losses.

(August 30, 2010 Correspondence from Michael D. Hutchens/Daniel L. Payne to Lawrence M. Baill, attached as Ex. 8 to Ertz Aff.)  According to Columbia, CGL coverage is void pursuant to the policy's Concealment and Fraud Condition.  (Id.)  Recently, Columbia claimed it would not have reinstated Tibbott's CGL policy, on June 8, 2010, had it known of the June 4, 2010 fire.  (See Ex. 7 at January 26, 2012 Correspondence from Daniel L. Payne to Daniel A. Haws)  Columbia also claimed no CGL coverage exists for additional insureds as no coverage was available to Tibbott for the fire.  (See Ex. 7 at August 30, 2010 from Michael D. Hutchens/Daniel L. Payne to Lawrence M. Rocheford)

## VI.    Columbia's Refusal to Defend and Denial of Coverage to Tibbott

Columbia has also denied coverage to Tibbott. (August 20, 2010 Correspondence from Curtis Silvey ("Silvey") to Daniel Tibbott, attached as Ex. 9 to Ertz Aff.)  According to Columbia, no CGL coverage is available as the policy was cancelled for non-payment of premiums on May 25, 2010. (Id.)  Columbia re-instated the policy on June 8, 2010 based on Tibbott's representation that he was not aware of any losses. (Id.)  Because Tibbott was aware of the June 4, 2010 fire loss, Columbia determined its decision to reinstate the CGL policy to the cancellation date is void and denies any coverage obligations since the CGL policy was not in effect on June 4, 2010. (Id.)

Columbia's August 2010 denial letter to Tibbott, however, only involved coverage under the CGL policy. (Id.)  Though Columbia has never denied coverage under Tibbott's CUL policy, it has failed to defend Tibbott, Comtrac or Comcast in the underlying litigation. (Id.; see also January 11, 2012 Deposition of Curtis Silvey, pp. 42-43 & 82, attached as Ex. 10 to Ertz Aff.)  According to Columbia, no defense is owed because CGL coverage was voided under the Fraud and Concealment provision since Tibbott knew of the June 4, 2010 "fire event" when he reinstated coverage. (See Ex. 7 at January 26, 2012 Correspondence from Daniel L. Payne to Daniel A. Haws)

As for the CUL policy, Columbia contends there is no duty to defend because Tibbott failed to maintain the underlying CGL policy which will "apply as if the underlying CGL Policy was in full effect." (Id.)  "If the underlying

8

CGL Policy was in full effect, Columbia would have no duty to defend . . . under the Umbrella Policy."  (Id.; see also Ex. 10, Silvey Depo., at pp. 43-44 & 65-67)

## VII.   Tibbott's Insurance History With Columbia

Tibbott purchased commercial, excess and automobile insurance from Columbia beginning in 2007.  (January 11, 2012 Deposition of Juanita Thomas Christy, pp. 4, 9, 10 & 28, attached as Ex. 11 to Ertz Aff.; Silvey Depo. at pp. 117-18, attached as Ex. 10 to Ertz Aff.)  Tibbott never made a claim for coverage with Columbia prior to the incident giving rise to the underlying action.  (Christy Depo. at p. 10, attached as Ex. 11 to Ertz Aff.)

## VIII.   The Columbia Insurance Policies

### A.   The CGL Policy

Tibbott's CGL policy had $1,000,000 per occurrence liability limit for the November 30, 2009 to November 30, 2010 period.  (CGL Policy No. CGSAR20625, attached as Ex. 12 to Ertz Aff.)  The policy premium was $1,102. (Id. at Common Policy Declarations)

The policy's insuring agreement required Columbia to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and to "defend the insured against any 'suit' seeking those damages."  (Id. at Section I – Coverages A, 1. Insuring Agreement, Form CG 00 01 12 07, Page 1 of 15)  The CGL policy applies "[s]eparately to each insured against whom claim is made or "suit" is

brought."  (Id. at Section IV Commercial General Liability Conditions, Paragraph 7, Form CG 00 01 12 07, Page 12 of 15)

     The policy provides that:

> reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided: (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"[2]; and (b) such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

(Id. at Section 1 – Coverages, 2. Exclusions, Form CG 00 01 12 07, Page 2 of 15)  The Supplementary Payments Provision also provides for the payment of defense fees and litigation expenses of an indemnitee of the insured if both are named in a "suit," as long as the insured is being defended and the suit against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in an "insured contract," the insurance applies to such liability assumed by the insured, the obligation to defend has also been assumed by the insured, no conflict exists and as long as they both agree to assignment of the same counsel.  (Id. at Supplementary Payments, Coverages A and B, Form CG 00 01 12 07, Page 8 of 15)

---

[2] An "insured contract" includes a "contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."  (Id. at Section V – Definitions, Form CG 00 01 12 07, Page13 of 15)

The CGL also policy contains four relevant Endorsements, three of which involve additional insured coverage.  The Additional Insured Designated Person or Organization Endorsement states:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

Names of Additional Insured Person(s) Or Organization(s)

> Information required to complete this Schedule, if not shown above, will be shown in the Declarations.
>
> Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:
>
> A. In the performance of your ongoing operations;
>
> * * *

(Id. at Additional Insured – Designated Person or Organization Endorsement, Form CG 20 26 07 04, Page 1 of 1)  The Schedule, however, does not show any person or organization as an additional insured.  (Id.)  The Additional Insured – Owners, Lessees Or Contractors – Completed Operations Endorsement also fails to identify any person or organization in the Schedule.  (See Additional Insured – Owners, Lessees or Contractors – Completed Operations

Endorsement, Form CG 20 37 07 04, Page 1 of 1)   The "General Liability

Premier Endorsement" revises the Who Is An Insured Section to include:

> 4.      Any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> > a.      Your acts or omissions; or
> >
> > b.      The acts or omissions of those acting on your behalf;
>
> in the performance of your ongoing operations for the additional insured.
>
> A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.
>
> * * *

(Id. at General Liability Premier Endorsement, Form CG 500 (6-07), Page 1 of 5)

Finally, the Fraud and Concealment Endorsement provides:

**CONCEALMENT OR FRAUD CONDITION**

> This policy is amended to include the following additional condition or if the policy now contains a similar condition, it is deleted and the following substituted:
>
> Concealment or fraud.  This entire policy shall be void if, whether before or after a loss, any insured has intentionally concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or the interest of any insured therein, or in the case of any fraud or false swearing by any insured relating thereto.

\* \* \*

(Id. at Concealment or Fraud Condition Endorsement, Form IL-165 (7-86))

## B.   The CUL Policy

Columbia issued a CUL policy to Tibbott for the December 1, 2009 to December 1, 2010 period.  (CUL Policy No. CUPAR30524, attached as Ex. 13 to Ertz Aff.)  In March 2010, Tibbott increased his umbrella limit to $5,000,000.  (Id. at Declarations)   The Declarations contain a Schedule of Underlying Insurance which includes a workers compensation/employers liability policy, an auto policy, and the CGL policy issued by Columbia.  (Id.)

The CUL contains the following insuring agreement:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.   Insuring Agreement**

a.   We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies.  ***We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage*** or the limits of "underlying insurance" have been exhausted.   \* \* \*

(CUL Coverage Form, CU 00 01 12 07, Page 1 of 17)  (Emphasis added).

"The word 'insured' means any person or organization qualifying as such under Section II – Who Is An Insured."  (Id.)  The Umbrella policy defines an "Insured" as follows:

**SECTION II – WHO IS AN INSURED**

* * *

    3.    ***Any additional insured under any policy of "underlying insurance"[3] will automatically be an insured under this insurance***.

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by an "underlying insurance."

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

* * *

(Id. at Page 10 of 17) (Emphasis added).

The CUL policy contains a provision entitled "Maintenance of/Changes To Underlying Insurance, stating:

**13.    Maintenance Of/Changes To Underlying Insurance**

The "underlying insurance" listed in the Schedule of "underlying insurance" in the Declarations shall remain in full effect throughout the policy period except for reduction of the aggregate limit due to payment of claims, settlement or judgments.

---

[3] "[U]nderlying insurance" means any policies of insurance listed in the Declarations under the Schedule of "underlying insurance." (Id. at p. 16 of 17)

Failure to maintain "underlying insurance" will not invalidate this insurance.  However, this insurance will apply as if the "underlying insurance" were in full effect.[4]

* * *

(Id. at Page 13 of 17)

In addition to the duty to defend the insured contained in the insuring agreement, the CUL policy states, in part, as follows:

**5.     Other Insurance**

a.       * * *

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit".  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

* * *

(Id. at Page 12 of 17)

The CUL policy also allows for attorney's fees and litigation expenses under both the insured contract exception to the Contractual Liability Exclusion and the Supplementary Payments provision of the policy.  (Id. at Pages 2 & 8 of 17)  The CUL policy contains a Separation of Insureds provision identical to the CGL policy.  (Id. at Page 12 of 17)

---

[4] This relates to the Loss Payable provision: "[l]iability under this Coverage Part shall not apply unless and until the insured or insured's 'underlying insurer' has become obligated to pay the 'retained limit'.  Such obligation by the insured to pay part of the 'ultimate net loss' shall have been previously determined by a final settlement or judgment after an action trial or written agreement between the insured, claimant and us."  (Id. at Pages 12-13 of 17)

## IX.    The Declaratory Judgment Action

In April 2011, Columbia filed a declaratory judgment action against Tibbott, Comtrac, Comcast, Woodmount and Indehar.   (Columbia's Complaint in Declaratory Judgment (Docket No. 1), dated April 22, 2011, attached as Ex. 14 to Ertz Aff.)  Columbia sought a determination that the CGL policy issued to Tibbott does not provide coverage for the underlying lawsuit, and a declaration that it owes no duty to defend or indemnify Tibbott, Comcast or Comtrac.   (Id.) Columbia did not reference the CUL policy in its declaratory judgment action. (Id.)

In support of its request for declaratory relief, Columbia claims the CGL policy's Concealment and Fraud Condition applies because Tibbott did not report the June 4, 2010 fire loss when he sought to reinstate the policy on June 8, 2010 for non-payment of his premium, retroactive to the May 25, 2010 cancelation date.  (Id. at ¶¶ 18-24)  According to Columbia, it informed Tibbott that the policy could only be reinstated "retroactively to May 25, 2010 as long as there had been no losses since the Policy had been canceled" and relied on Tibbott's statement that there had been no losses.  (Id. at ¶¶ 22-24)  As for Comcast and Comtrac, Columbia contends they are not additional insureds under the Premier Endorsement because Tibbott did not agree in writing to add them to his CGL policy.  (Id. at ¶¶ 26-28)

Comtrac's counterclaim alleges that coverage is provided by Tibbott's CGL and CUL policies, seeking a declaration that Columbia owes a duty to defend

and indemnify in the underlying litigation.   (Counterclaim for Declaratory Judgment, dated September 9, 2011, attached as Ex. 15 to Ertz Aff.)

## X.   Deposition Testimony

### A.   The 15-Day Grace Period

Tibbott owed $19.20 in past-due premiums on his CGL policy when he received Columbia's May 25, 2010 cancelation notice. (May 2010 Cancelation Notice/Invoice, attached as Ex. 16 to Ertz Aff.; see also Silvey Depo. at pp. 116-17, Ex. 10 to Ertz Aff.)   Columbia sends cancelation notices to insureds owing more than $5.00.  (Christy Depo. at p. 21, Ex. 11 to Ertz Aff.)

Tibbott issued a check bringing current his CGL policy on June 8, 2010, which Columbia accepted.  (Id. at pp. 22-23; Silvey Depo. at p. 73, Ex. 10 to Ertz Aff.)  The CGL policy was reinstated to May 25, 2010.  (Id. at p. 74)  Columbia did <u>not</u> cancel the CGL policy on May 25, 2010.  (Id. at p. 73)  Nor did it return premium payments made by Tibbott.  (Id. at pp. 99-101; Christy Depo. at p. 30, Ex. 11 to Ertz Aff.)  Christy believes Tibbott's June 8, 2010 payment would have paid his CGL premiums through at least the end of June 2010.   (Christy Depo. at pp. 31-32, Ex. 11 to Ertz Aff.)

It was not until September 23, 2010 that Columbia canceled Tibbott's CGL policy.  (Silvey Depo. at pp. 72-76, Ex. 10 to Ertz Aff.; Christy Depo. at pp. 27-28, Ex. 11 to Ertz Aff.)  The CGL policy was therefore in effect in June 2010.  (Silvey Depo. at pp. 76 & 78, Ex. 10 to Ertz Aff.)  Columbia did not know why, when it decided to deny coverage for fraud and concealment, it did not cancel the CGL

policy effective May 25, 2010 and return Tibbott's unused premiums.  (Id. at p. 74)

According to Silvey, Columbia's decision to reinstate coverage for Tibbott back to May 25, 2010 was based on Tibbott's misrepresentation that there were no losses since the cancelation date, a conversation the agent relayed to Columbia's underwriting department.  (Id. at pp. 106 & 109)  Columbia, however, has a written 15-day grace period allowing payment of the past due premium to automatically reinstate a CGL policy.  (Id. at pp. 112-13 & 137; Christy Depo. at pp. 22 & 48, Ex. 11 to Ertz Aff.)  During this grace period, Tibbott could reinstate the policy, without a lapse in coverage, simply by making payment within 15 days of May 25, 2010.  (Silvey Depo. at p. 113, Ex. 10 to Ertz Aff.)  Under Columbia's grace-period policy, the insured is not required to submit anything orally or in writing confirming no loss or claim occurred during the time between cancelation and renewal.  (Id. at pp. 115-16)  The 15-day grace period is a written policy at Columbia and was well-known by customer service and underwriters in June 2010.  (Christy Depo. at p. 22, Ex. 11 to Ertz Aff.; see also Columbia Late Payment Handling procedure (COL000898-899), attached as Ex. 17 to Ertz Aff.)

Tibbott undisputedly made payment qualifying for automatic reinstatement of the CGL policy within Columbia's 15-day grace period.  (Silvey Depo. at pp. 129-131 & 138; Christy Depo. at pp. 22-23, Ex. 11 to Ertz Aff.)  As such, Silvey could not explain how Tibbott's conversation with his agent was a material misrepresentation if Columbia would have reinstated the policy, without question,

if payment was made during the grace period.  (Silvey Depo. at pp. 141-42, Ex. 10 to Ertz Aff.)

**B.    Confusion Over "Claim" vs. "Loss" Question**

Columbia denied CGL coverage to Tibbott for the fire loss, on August 20, 2010, based on the policy's Concealment and Fraud Condition.  (Id. at pp. 29, 30-31, 100-01 & 132-33)   That provision voids the policy if any insured has intentionally concealed or misrepresented any material fact or circumstance to Columbia.  (Id. at pp. 31-32 & 94-95)  The CGL policy does not define the phrase "material misrepresentation" but Silvey believes a misrepresentation is material if it was relied upon by Columbia.  (Id. at pp. 94 & 135-36)

Here, Columbia contends Tibbott's statement to his agent, Scallion, that there were no losses was the basis for Columbia's willingness to reinstate the policy.  (Id. at pp. 135-36)   Significantly, however, Columbia's underwriter, Christy, has absolutely no recollection of speaking to Tibbott's agent on June 8, 2010 about Tibbott's policy.  (Christy Depo. at pp. 23-25, Ex. 11 to Ertz Aff.) Christy maintains notes of calls as part of her normal procedure and she did not document any such conversation with Tibbott's agent that day.[5]  (Id. at pp. 23-24 & 26-27)   In fact, Christy testified that any call that would be made during Columbia's grace period would have gone directly to customer service.  (Id. at p.

---

[5] Christy did speak with Scallion on June 29, 2010, after the policy was reinstated.  (Id. at pp. 24-25)

23)  It is Christy's "understanding within a 15-day grace period customer service reinstates without asking" insureds about claims or losses.  (Id. at p. 26)

Not only is there confusion over whether Scallion ever spoke to someone at Columbia about his conversation with Tibbott, but a discrepancy also exists over the terminology involved.  Columbia claims it denied CGL coverage to Tibbott based on his June 8, 2010 statement to Scallion that he was unaware of any "losses" between the cancellation date (May 25, 2010) and the date requested for reinstatement (June 8, 2010).  (Silvey Depo. at pp. 8-9, 54-55, 94-95 & 103-05, Ex. 10 to Ertz Aff.)   Silvey believes this constitutes concealment/misrepresentation by Tibbott since Tibbott knew about the fire when he sought to reinstate the policy.  (Id. at p. 35)  Columbia made its coverage decision based on what Scallion said occurred during reinstatement.  (Id. at pp. 14-15, 87-89, 103-08 & 121)  Columbia admits it never spoke to Tibbott about his alleged conversation with his agent.  (Id. at pp. 87, 95 & 106-07)

In fact, Columbia's notes[6] discussing the alleged conversation between Tibbott and Scallion use the word ***claims*** and not losses.  (Id. at pp. 48-50 & 90) This is significant since Columbia admits the terms "loss" and "claim" are distinct. (Id. at pp. 36-37 & 89-90)  The term "loss" is not defined in Columbia's policy. (Id. at pp. 89 & 93)

---

[6] Claims Handler, Gene DeVore and his supervisor, Turner, accurately record conversations in Columbia's claim notes.  (Id. at pp. 51-53)

Silvey agreed that if Tibbott had been asked if there had been any "claim" and he replied "no" that could be an unintentional failure to disclose since he does not recall if a claim regarding the June 4, 2010 fire was asserted prior to June 8, 2010.[7]  (Silvey Depo. at pp. 36-37, 93-94 & 101-02)  He does not know what Tibbott knew or understood the words "loss" or "claim" to mean from an insurance context.  (Id. at pp. 144-46)  He also does not "know with certainty what [Tibbott] thought at that time."  (Id. at p. 146)  Silvey confirms that he was not a part of the conversation between Tibbott and Scallion or the agent and DeVore.  (Id. at pp. 51-55, 90 & 108)

### C.   Tibbott Requests Additional Insured Coverage

Columbia's claim file notes indicate that Tibbott repeatedly asked for additional insured coverage.  (Id. at pp. 82-83; see also Christy Depo. at pp. 10-13 & 36-38, Ex. 11 to Ertz Aff.)  These notes also reveal that Comtrac was added to the CGL policy as an additional insured prior to the policy cancellation in September 2010.  (Id. at pp. 35-36)

### 1.   Premier Endorsement

Tibbott's insurance agency contacted Columbia in 2008 reporting that Tibbott was required to name additional insureds and inquiring whether his CGL policy, as written, provides that coverage.  (Silvey Depo. at pp. 82-83, Ex. 10 to

---

[7] Post-depositions, Columbia claims that Tibbott's knowledge of and failure to disclose the fire is an intentional concealment to explain that it does not matter if Scallion asked about losses, claims or potential claims during the grace period. (Curtis Silvey's Errata Sheet, attached as Ex. 18 to Ertz Aff.)

Ertz Aff.)   Columbia advised that Tibbott's CGL policy contains a premier endorsement which provides coverage for additional insureds.  (Id. at pp. 82-84) Specifically, Columbia's underwriting stated that if Tibbott "had the premium (sic) endorsement, they do have the additional insureds as required by contract." (Christy Depo. at pp. 37-38 & 40-41, Ex. 11 to Ertz Aff.)  Even though Columbia admits the Premier Endorsement in Tibbott's CGL policy provides additional insured coverage as required by contract, it questions whether Tibbott's contract necessarily required Comtrac be listed as an additional insured.  (Silvey Depo. at pp. 33-34, Ex. 10 to Ertz Aff.; but see Independent Contractor Agreement, Ex. 2 to Ertz Aff.)

### 2.    The Illusory Additional Insured Endorsements

In March 2010, Tibbott's insurance agency asked Columbia underwriters to add additional insured endorsements to Tibbott's CGL policy.  (Christy Depo. at pp. 10-12, attached as Ex. 11 to Ertz Aff.)  Columbia's underwriter could not explain why these endorsements were included in Tibbott's CGL policy without identifying any additional insured(s) on the Schedule.  (Id. at pp. 12-13)  She agreed that doing so was "unusual" and that with no one shown on the Schedule "they would apply to nothing."  (Id. at pp. 12-16)

### E.    The Insured Contract Provision

Columbia's CGL policy provides coverage for insured contracts.  (Silvey Depo. at pp. 96-97, attached as Ex. 10 to Ertz Aff.)  Under certain situations, the supplementary payments provision provides defense and indemnification for

insured contracts.  (Id. at p. 97)  Columbia conceded that Tibbott agreed in the Independent Contractor Agreement to assume the tort liability of Comtrac.  (Id. at pp. 97-98)   According to Silvey, the Tibbott/Comtrac contract is an insured contract.  (Id. at pp. 98 & 121-22)  Silvey does not know when he received notice of the existence of the insured contract.  (Id. at pp. 121-22)

### F.    The Umbrella Policy

Tibbott was paid-up on his CUL policy at the time of the June 4, 2010 fire. (Id. at pp. 19, 32, 59-60 & 84-85; Christy Depo. at p. 39, Ex. 11 to Ertz Aff.) Silvey does not remember ever discussing coverage or issuing a denial under the CUL policy.  (Silvey Depo. at pp. 24, 29, 38-40 & 67, Ex. 10 to Ertz Aff.)

A claim note indicates that Tibbott's insurance agent asked Columbia if he had coverage available under the CUL in July 2010.  (Id. at pp. 25-28)  Tibbott spoke with Columbia in late July in order to confirm that the CUL policy was paid in full.  (Id. at p. 61)   Columbia has never responded, verbally or writing, to Tibbott or anyone else, regarding coverage for the fire under the CUL policy.  (Id. at pp. 27-29 & 61-62)

Columbia admits that an insured's failure to maintain a CGL policy does not invalidate a CUL policy.  (Silvey Depo. at pp. 62-63, Ex. 10 to Ertz Aff.) Yet Columbia claims no duty to defend arises under the CUL policy because the CGL policy was not maintained by Tibbott.  (Id. at pp. 64-66 & 127)  Silvey opined that no duty to indemnify arises until liability has reached $1,000,000 since the CUL policy applies as if the underlying insurance was in full effect.  (Id. at pp. 127-28)

23

Significantly, Silvey admits that "[a]ny additional insured under any policy of underlying insurance will automatically be an insured under this coverage." (Id. at pp. 67-71; see also Christy Depo. at pp. 35-36, Ex. 11 to Ertz Aff.) Tibbott's CGL policy is listed on the CUL declarations as scheduled underlying insurance.  (Silvey Depo. at pp. 68-69, Ex. 10 to Ertz Aff.)  At no point was the CUL Declarations or the schedule of underlying insurance changed to remove the CGL policy Columbia issued to Tibbott.  (Id. at p. 71)  Silvey concedes that if Comtrac was an additional insured under the CGL policy, Comtrac would automatically be additionally insured under the CUL policy.  (Id. at pp. 70-71)  He also admitted that Comtrac received notice as an additional insured under the CGL policy, and that Comtrac had an interest in Tibbott's policy by August 2010. (Id. at pp. 80-82; see also Columbia's Response to Comtrac's Request for Admissions (Set II) at Nos. 11-12, attached as Ex. 19 to Ertz Aff.)

## XI.   Discovery Admissions

Columbia has not denied coverage under Tibbott's CUL policy, which was in full force during the entire policy period.  (Columbia's First Supplemental Responses to Comtrac's Request for Admissions, Integrated Interrogatory and Document Request, Nos. 5-8 & 12, dated February 13, 2012, attached as Ex. 20 to Ertz Aff.)  As for the CGL policy, Columbia would not have reinstated it without a lapse if Tibbott had notified it of the fire loss.  (Id. at No. 9)

Columbia goes so far as to deny that it has a grace period policy and instead, claims it sometimes/typically provides a courtesy reinstatement without

lapse if payment is made within 15 days of cancellation.  (Columbia's Response to Comtrac's Request for Admissions (Set II), at Nos. 14-15, dated March 30, 2012, attached as Ex. 19 to Ertz Aff.)   This is contrary to Columbia's sworn testimony and internal documentation which provides that "[t]he Direct Bill Department will automatically reinstate the policy with no lapse in coverage" if payment is received from the insured within one to 15 days after the expiration date.  (Columbia Late Payment Handling procedure, attached as Ex. 17 to Ertz Aff.)   Columbia does not require customer service to inquire regarding events that occurred during the lapse.  (Columbia's Response to Comtrac's Request for Admissions (Set II), at Nos. 16-17, attached as Ex. 19 to Ertz Aff.)   Nevertheless, Columbia has denied coverage even though it received Tibbott's payment on June 8, 2010, within 15 days after May 25, 2010, because Tibbott did not disclose the June 2010 "fire event."  (Id. at No. 18)

## SUMMARY / DECLARATORY JUDGMENT STANDARD

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  *Khoury v. Group Health Plan, Inc.,* 615 F.3d 946 (8th Cir. 2010); *see also* Fed. R. Civ. P. Rule 56(a) & (c).  In a case of actual controversy, a court may "declare the rights and other legal relations of any interested party seeking such a declaration whether or not further relief is or could be sought."  28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57.  An actual controversy exists if "there is a

substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Caldwell v. Gurley Refining Co.,* 755 F.2d. 645, 649 (8th Cir. 1985).

## ARGUMENT AND AUTHORITIES

### I.    Federal Courts Apply State Substantive Law

When "a federal court sits in diversity jurisdiction pursuant to 28 U.S.C. § 1332 it applies state substantive law." *U.S. Fire Ins. Co. v. Green Bay Packaging, Inc.*, 66 F.Supp.2d 987, 994 (E.D. Wis. 1999). State law governs the interpretation of insurance policies. *Progressive Northern Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010). Here, Minnesota law applies, as Minnesota is the forum state and no one has raised a choice-of-law claim. *Id.*

### II.    The Duty to Defend and Indemnify

In Minnesota, an insurer owes an insured two duties: the duty to defend and the duty to indemnify. *Nelson v. American Home Assur. Co.*, 824 F.Supp.2d 909, 915 (D. Minn. 2011). The "duty to defend is distinct from and broader than its duty to indemnify the insured." *Eyeblaster, Inc. v. Federal Ins. Co.*, 613 F.3d 797, 801 (8th Cir. 2010).

"[A]n insurer's obligation to defend is contractual." *FACE, Festivals and Concert Events, Inc. v. Scottsdale Ins. Co.*, 632 F.3d 417, 420 (8th Cir. 2011). The duty to defend "arises if any part of the cause of action is arguably within the scope of policy coverage." *Id.* "Where the pleadings do not raise a claim arguably within the scope of coverage, the insurer has no duty to defend. . ." *Id.*

However, if the insurer has independent knowledge of facts indicating a potentially covered claim, the insurer may not simply rely on the pleadings. *Id.*; *Truchinski v. Cashman*, 257 N.W.2d 286, 287 (Minn. 1977) (an insurer has a duty to defend in Minnesota "[i]f any part of a cause of action against the insured arguably falls within the scope of the insurance coverage, either on the face of the complaint or from facts known to the insurer.")

"The burden is on the insurer to prove that it has no duty to defend, and in so doing the insurer must show that 'each claim asserted in the lawsuit clearly falls outside the policy.'" *Eyeblaster,* 613 F.3d at 801.   "Under Minnesota law, an insured is entitled to have its case considered by the fact-finder once it has established a prima facie case." *Id.* at 802.   "The insurer then has the burden to prove that an exclusion applies." *Id.*   "Exclusions are narrowly interpreted against the insurer." *Id.*

As for the duty to indemnify, it "arises only if the insured ultimately proves up facts showing coverage." *Nelson*, 824 F.Supp.2d at 915.   Stated differently, "[t]he duty to indemnify 'is triggered only when liability is assessed on a claim within the policy coverage.'" *Scottsdale Ins. Co. v. RiverBank*, 815 F.Supp.2d 1074, 1080 (D. Minn. 2011).

## III.   Coverage Exists Under The CGL Policy Columbia Issued To Tibbott

### A.   Columbia's Grace Period Precludes It From Voiding Coverage

If an insurer provides a grace period and the premium is not paid during the grace period, a default takes place as of the date when the premium was

due.  *See Royal Ins. Co. v. Western Cas. Ins. Co.*, 444 N.W.2d 846, 847 (Minn. Ct. App. 1989), *citing Erickson v. Equitable Life Assur. Soc'y of United States*, 258 N.W. 736, 741 (Minn. 1935).  The Minnesota Supreme Court has found that no insurance coverage was in force at the time of an accident where the policy lapsed for lack of premium payment because it was not provided by the insured until nine days *after* the expiration of the grace period and resulted in the issuance of a new policy.  *Eichten v. Klein,* 160 N.W.2d 33, 34-36 (Minn. 1968); *see also Block v. Mutual Service Cas. Ins. Co.*, 2002 WL 554403 at *2 (Minn. Ct. App. 2002)[8] (MSI's internal nine-day grace period policy required the insured to pay her premium on or before June 16 in order to continue coverage after she received notice of the June 7 cancelation date; and where payment was not made until June 25, the policies were held to be in default and no coverage was provided for the insured's June 12 accident); *Parrott v. Grinnell Mut. Reinsurance Co.*, 2003 WL 21652502 at *2 (Minn. Ct. App. 2003) (recognizing that a premium payment within the designated "grace period" results in reinstatement of coverage by allowing the original policy to remain in force).

   In this case, unlike the insureds in *Eitchen*, *Royal*, *Block* and *Parrott*, Tibbott undisputedly submitted his premium payment to Columbia on June 8, 2010, within Columbia's 15-day grace period.  (Silvey Depo. at pp. 129-31 & 138, Ex. 10 to Ertz Aff.; Christy Depo. at pp. 22-23, Ex. 11 to Ertz Aff.)  The CGL policy was therefore reinstated with continuous coverage from May 25, 2010, and

---

[8] All unpublished opinions are cited pursuant to L.R. 7.1 (i).

was in full force at the time of the June 4, 2010 fire at the Woodmount Townhouses.

**B.     No Material Misrepresentation Exists Due To The Confusion Over Whether Tibbott Was Improperly Asked About A "Loss" Or "Claim" During Columbia's Grace Period**

Columbia denied coverage based on the hearsay statement from agent Scallion that Tibbott told him, when he sought to make his premium payment within the grace period, that he was unaware of any "losses."  Not only was this question contrary to Columbia's grace period policy permitting reinstatement with no questions asked, but it is doubtful if it was even asked since there is no record of this conversation in Milner Insurance Agency's file and Columbia's underwriter, Christy, denied having such a conversation with Scallion on June 8, 2010, as Scallion contends.  (Christy Depo. at pp. 23-27, Ex. 11 to Ertz Aff.)  Assuming for argument's sake, that a June 8, 2010 conversation did occur between Scallion and Tibbott  regarding Tibbott's awareness of any "losses," there is absolutely no evidence that this statement constitutes a material misrepresentation or an intentional concealment that voids coverage under Columbia's Fraud and Concealment provision which states:

> This entire policy shall be void if, whether before or after a loss, any insured has intentionally concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or the interest of any insured therein, or in the case of any fraud or false swearing by any insured relating thereto.
>
> * * *

(CGL Policy, attached as Ex. 12 to Ertz Aff.)

In Minnesota, "only misstatements of fact made with the intent to defraud an insurer operate to void the policy" of insurance.  *See Henning Nelson Const. Co. v. Fireman's Fund American Life Ins. Co.*, 383 N.W.2d 645, 654 (Minn. 1986).  In *Henning*, the court recognized that a policy will not be void for fraud or misrepresentation if the insured's statements were simply honest mistakes.  *Id.* Instead, "[f]raud requires evidence of a false representation related to a past or present material fact that is susceptible to knowledge and that the person representing the fact knows is false or asserts as his own knowledge."  *Carye v. Illinois Farmers Ins. Co.*, 2006 WL 3719479 at *2 (Minn. Ct. App. 2006)  "The representer must intend and actually induce another person to act in reliance on the representation and cause damages."  *Id.*

In *Carye*, the Minnesota Court of Appeals noted that Illinois Farmers did not identify any evidence demonstrating that it relied on the information allegedly supplied by the insured or that it would not have issued the policy had accurate information about the Carye's prior homeowners' claims been provided.  *Id.* at *3. Likewise, in this case, Columbia is unable to show that the CGL policy is void under its Fraud and Concealment provision because its grace period reinstates the policy without a lapse in coverage if a premium payment is made within 15 days of the cancelation notice – no questions asked.  (Late Payment Handling procedure, attached as Ex. 17 to Ertz Aff.)

Even more importantly, however, there is no evidence of Tibbott's intent to defraud or deceive Columbia since no one at Columbia has ever spoken to

Tibbott about his alleged conversation with agent Scallion.  (Silvey Depo. at pp. 87, 95, 106-07, Ex. 10 to Ertz Aff.)  Moreover, Columbia's claim file notes actually indicate that Scallion asked Tibbott if he was aware of any "claim" and not "losses" at the time Tibbott sought to make his premium payment.  (Id. at pp. 48-55, 90 & 108)   Columbia admits that there is a distinction, in the insurance context, between these two terms (neither of which are defined in Columbia's CGL policy) and that it does not know if Tibbott was aware of a claim being made by any third-party against him for the fire at the Woodmount Townhouses when he allegedly spoke with Scallion.  (Id. at pp. 36-37 & 89-90)

Because there is absolutely no admissible evidence[9] that Tibbott intended to deceive Columbia, let alone that Tibbott's alleged statement to Scallion was material given Columbia's policy to reinstate a policy without lapse if premium payment is made within the grace period, there is no basis to void CGL coverage for the Woodmount Townhouses fire under the Fraud and Concealment Endorsement.

> **C.    The CGL Policy Should Be Reformed As The Additional Insured Endorsement Provided Illusory Coverage And The Premier Endorsement Provides Coverage Due To The Contractual Requirement That Comtrac Be Additionally Insured By Tibbott**
>
> > **i.    Comtrac Is Additionally Insured Under The Premier Endorsement**

---

[9] Hearsay is inadmissible and must be disregarded on a motion for summary judgment.  *Blackwell v. Eckman*, 410 N.W.2d 390, 391 (Minn. Ct. App. 1987); *see also In re Trusts A & B of Divine,* 672 N.W.2d 912, 921 (Minn. Ct. App. 2004) ("[w]hen deciding any summary-judgment motion, the district court must disregard hearsay evidence that would be inadmissible at trial.")

Additional insured endorsements in Minnesota require the insurer to defend and indemnify where the underlying complaint alleges facts that might fall within the coverage provided by the insurance policy. *Lift-Stak & Stor, Inc. v. Lumbermens Mut. Cas. Co.*, 2000 WL 1376552 at *3 (Minn. Ct. App. 2000). In *Lift-Stak*, Corporate Express leased a forklift from Lift-Stak pursuant to an agreement requiring Corporate Express to purchase liability insurance insuring both Corporate Express and Lift-Stak. *Id.* at *1. Corporate Express purchased liability insurance from Lumbermens. *Id.* After Corporate Express' employee was injured while operating the forklift, he sued Corporate Express and Lift-Stak. *Id.* Lift-Stak tendered to Lumbermens who refused to defend. *Id.* Lift-Stak sought a declaration that the policy issued to Corporate Express provided coverage for the employee's claims requiring the insurer to defend, and possibly indemnify, Lift-Stak. *Id.* Following denial of summary judgment, Lift-Stak appealed. *Id.*

The Minnesota Court of Appeals found Lift-Stak to be insured under the policy Lumbermens issued to Corporate Express. *Id.* at *3. Specifically, the court concluded that the Additional Insured Endorsement, which provided coverage for persons or organizations where required by written or oral agreement, applied since the Lumbermens policy obtained by Corporate Express "clearly provides coverage for Lift-Stak as an "insured," as required by the lease contract," and therefore required Lumbermens to defend and indemnify Lift-Stak on Mieske's claims. *Id.*

As in *Lift-Stak*, the CGL policy issued by Columbia contains a Premier Endorsement that identifies an insured as any person/organization for whom Tibbott is performing operations when he and such person/organization agreed in a written contract or agreement to be added as an additional insured with respect to liability for property damage caused by Tibbott's acts or omissions in the performance of his operations.  (CGL Policy, Premier Endorsement, attached as Ex. 12 to Ertz Aff.)  Since Tibbott contractually agreed: (1) to be responsible for liability insurance; (2) that "COMTRAC Services is to be named additionally insured on Certificate"; and (3) to defend and indemnify Comtrac for claims arising out of his work, Comtrac is an additional insured pursuant to the Premier Endorsement in the CGL policy.  (Independent Contractor Agreement, at ¶¶ 3-4, attached as Ex. 2 to Ertz Aff.)

### ii.    The Additional Insured Endorsements Are Illusory

Columbia's CGL policy also contained Additional Insured Endorsements as requested by Tibbott, but they do not identify any person or organization on the Schedule, which is contrary to Columbia's ordinary practice and procedure. (CGL Policy, Additional Insured Endorsements, attached as Ex. 12 to Ertz Aff.) Thus, Columbia's failure to identify Comtrac on the Schedule for the Additional Insured Endorsements provided illusory coverage, contrary to the reasonable expectations of both Comtrac and Tibbott.

In Minnesota, the illusory coverage doctrine is "an independent means to avoid an unreasonable result when a literal reading of a policy unfairly denies

coverage." *Jostens, Inc. v. Northfield Ins. Co.*, 527 N.W.2d 116, 118 (Minn. Ct. App. 1995).  Stated differently, "[a] policy's coverage is illusory if it 'turns out to be functionally nonexistent." *Id.* at 119.

Here, despite the contractual requirement to name Comtrac as additionally insured, and evidence of Tibbott's repeated request for additional insured coverage, as well as assurance that Tibbott's CGL policy provided additional insured coverage, Columbia issued Additional Insured Endorsements which did not identify any person or organization on the Schedule thereby rendering coverage provided by the Endorsements illusory.

## IV. The CUL Policy Requires Columbia To Defend And Indemnify Comtrac As It Was An Additional Insured On the Scheduled Underlying Insurance Policy Per The CUL Declarations

"Minnesota law generally requires an umbrella insurance carrier to defend a party when the party's underlying insurer refused to do so." *Hawkins Chemical, Inc. v. Westchester Fire Ins. Co.*, 159 F.3d 348, 354 (8th Cir. 1998); *see also Grossman v. American Family Mut. Ins. Co.*, 461 N.W.2d 489, 494 (Minn. Ct. App. 1990).  In fact, *Grossman* holds that "if the primary insurer denies coverage, the excess insurer would be obligated to defend." *Id.* at 494.  Other courts in Minnesota have recognized that each insurer's obligation to defend is separate from the duty to indemnify and irrespective of whether the insurer provides primary or excess coverage.  *See National Union Fire Ins. Co. of Pittsburgh, PA v. Republic Underwriters Ins. Co.*, 429 N.W.2d 695, 698 (Minn. Ct. App. 1988).

To illustrate, in *Hawkins*, the umbrella policy issued by Westchester disclaimed a duty to defend when Hawkins' underlying insurer breached its own duty to defend.   159 F.3d at 355. Because the underlying insurer, North River, refused to defend Hawkins in a class action lawsuit based on a pollution exclusion in its policy, the court concluded that it was arguable that North River was not in breach of its duty and therefore arguably within the scope of Westchester's umbrella policy so that it was obligated to defend Hawkins when North River refused to do so.   *Id.* at 355.

Here, the Columbia CUL policy's insuring agreement requires Columbia to "defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the   limits of "underlying insurance" have been exhausted."   (Commercial Liability Umbrella Coverage Form, attached as Ex. 13 to Ertz Aff.)   Columbia's CGL policy is scheduled underlying insurance and it does not provide coverage according to Columbia's own admissions.[10]   (Id.)

---

[10] See *Westchester Fire Ins. Co. v. Continental Cas. Co.*, 2006 WL 786866 at *10 (Minn. Ct. App. 2006) (ruling that where Sowles was an additional insured under Continental's CGL policy, Sowles is also an additional insured under the umbrella policy due to the provision in the umbrella policy that allows for coverage as long as Sowles is covered under the scheduled underling insurance, which included Continental's CGL policy.)

Despite Comtrac's tender of defense[11], and Columbia's notice that it was denying coverage for the fire at Woodmount Townhouses under the CGL policy issued to Tibbott, Columbia has refused to defend in the underlying action. Under *Home Ins. Co.*, Columbia's failure to defend Comtrac in the underlying action is a breach of the CUL contract as a matter of law.[12]  658 N.W.2d at 534.

## V.   The Independent Contractor Agreement Between Tibbott and Comtrac Is An Insured Contract

In Minnesota, "a general indemnity agreement that includes an assumption of tort liability constitutes an insured contract."  *Soo Line,* 694 N.W.2d at 115. "Where courts have found an insured contact, the language expressed a clear intent to indemnify the other party for all tort liability."  *KBL Cable Services of the Southwest Inc. v. Liberty Mut. Fire Ins. Co.*, 2004 WL 2660709 at *5 (Minn. Ct. App. 2004)  "If a party has an insured contract, that party is in the same position as the insured for coverage purposes."

Here, the indemnification provision in the Independent Contractor Agreement requires Tibbott to indemnify Comtrac "against ***any and all claims,***

---

[11] Once an insured provides its primary or umbrella insurer with notice of a suit and opportunity to defend, it has tendered the defense even without an express request for a defense.  *The Home Ins. Co. v. National Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 533-34 (Minn. 2003).

[12] "An insured may recover from its insurer attorney fees it has incurred in a declaratory-judgment action only if there was a breach of a contractual duty ... ." *Soo Line Railroad Co. Brow's Crew Car of Wyoming,* 694 N.W.2d 109 at 116 (Minn. Ct. App. 2005)*; see also In Re Silicone Implant Ins. Coverage Litigation,* 667 N.W.2d 405, 422 (Minn. 2003) (noting that attorneys' fees are recoverable when an insurer breaches a duty to defend).

***liability or loss arising out of Independent Contractor's performance of the
work contemplated herein***, including but not limited to ***any claim or action for
damage or injury to person or property***… (Independent Contract Agreement,
at ¶ 4, attached as Ex. 2 to Ertz Aff.)  (Emphasis added).

"The phrase 'arising out of' has been given a broad meaning." *Andrew L.
Youngquist, Inc. v. Cincinnati Ins. Co.*, 625 N.W.2d 178, 183 (Minn. Ct. App.
2001).  It has "been described as meaning originating from, or having its origin in,
growing out of, or flowing from." *Id.* at 184.  As such, a "but for" or cause and
result relationship satisfies the policy provision. *Id.*

To illustrate, in *Youngquist*, Comm-Tech purchased insurance coverage
with Cincinnati naming Bitcher as an additional insured arising out of Comm-
Tech's ongoing operations. *Id.* at 183.  Cincinnati argued that this additional
insured endorsement limited liability to Bitcher for the vicariously liability it had for
any fault of Comm-Tech. *Id.*  The court of appeals disagreed with Cincinnati
noting that Klitzke's suit against Bitcher arose out of Comm-Tech's operations
and therefore coverage was provided to Bitcher as an additional insured. *Id.* at
184-86.

The Additional Insured Endorsement, in *Youngquist*, is similar to the
Independent Contractor Agreement between Tibbott and Comtrac in that both
contain the "arising out of" language.  Specifically, the indemnification provision
in the Agreement requires Tibbott to assume the tort liability of Comtrac.  (See
CGL and CUL Policies, attached as Exs. 12-13 to Ertz Aff.)  Columbia admits

37

that this language constitutes an insured contract that requires Columbia to defend and indemnify Comtrac under either the exception to the contractual liability exclusion or the supplementary payments provisions contained in both the CGL and CUL policies of insurance since but for Tibbott's operations, Woodmount Townhouses would not have sued Comtrac for damages.  (Id.; see also Silvey Depo. at pp. 97-98 & 121-22, Ex. 10 to Ertz Aff.)

## CONCLUSION

For any or all of the reasons discussed above, Comtrac is entitled to an Order from the Court granting its Motion for Summary Judgment and declaring that the CGL policy and/or the CUL policy Columbia issued to Tibbott provides coverage and a duty to defend and indemnify Comtrac in the underlying litigation.


Dated:  May 31, 2012                              MURNANE BRANDT

                                                   s/ Stacy E. Ertz
                                                  Daniel A. Haws #193501
                                                  Stacy E. Ertz #0267181
                                                  Kari L. Gunderman #0317299
                                                  Attorneys for Defendant
                                                  Comtrac Services, Inc.
                                                  30 East Seventh Street, Suite 3200
                                                  St. Paul, MN  55101-4919
                                                  (651) 227-9411
                                                  dhaws@murnane.com
                                                  sertz@murnane.com
                                                  kgunderman@murnane.com

1400820